# United States Court of Appeals for the Fifth Circuit

No. 23-30703

United States Court of Appeals
Fifth Circuit

**FILED**
September 4, 2024

Lyle W. Cayce
Clerk

Sheena Robertson,

*Plaintiff—Appellant*,

*versus*

United States of America, *on behalf of United States Department of Health and Human Services*,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:17-CV-1663

Before Ho, Duncan, and Oldham, *Circuit Judges*.

Per Curiam:*

Sheena Robertson sued a federally supported healthcare facility in Louisiana for medical malpractice, alleging that the doctor she saw negligently failed to diagnose and properly treat her for cauda equina syndrome (CES), a serious nerve condition that affects urinary function and causes

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-30703

numbness in genital areas. After a bench trial, the district court concluded that Robertson failed to prove her medical malpractice claim. We affirm.

Robertson's complaint alleges that her symptoms began in late April 2015. From late April to early May, she visited various healthcare providers for lower back pain and pain in her right leg. Over time, her symptoms worsened and included muscle spasms and numbness. By May 26, 2015, she had been to the emergency room multiple times, including twice in the previous three days. However, she alleges that the doctors she saw up to that point diagnosed her with back pain and sciatica.

On May 26, Robertson visited the Iberia Comprehensive Community Health Center and saw Dr. Danielle McLurkin.[1] Her complaint alleges that she informed Dr. McLurkin that the pain was worsening, that it was difficult to walk, that her genital areas were numb, and that she could not feel herself urinate. According to Robertson, despite her symptoms, Dr. McLurkin merely diagnosed her with lumbar radiculopathy, ordered an MRI pending insurance approval, and scheduled a one-month follow-up visit.

Robertson left the Iberia health center. However, in the middle of the night, she called 911 and went by ambulance to the hospital, where she was diagnosed with a urinary tract infection and discharged home.

The evening of May 27, Robertson was again transported by ambulance to the hospital, but she went to a different facility than her earlier emergency room visit. At this visit, she was diagnosed with a disc herniation causing CES. She had surgery on May 28, but continues to suffer the effects of CES.

---

[1] Robertson also saw Dr. McLurkin on May 7, 2015, but she does not challenge Dr. McLurkin's actions at that visit.

2

No. 23-30703

Robertson sued the Iberia health center, alleging that Dr. McLurkin negligently failed to properly diagnose and treat her for CES, which delayed Robertson's surgery and worsened her outcome. The Iberia health center is federally supported and is eligible for Federal Tort Claims Act coverage under 42 U.S.C. § 233(g)–(n), so the United States is the proper defendant in this case.[2]

After a bench trial, the district court dismissed Robertson's claims. The district court concluded that Robertson had not proved that Dr. McLurkin breached the standard of care, crediting Dr. McLurkin's testimony that she had discussed the possibility of CES with Robertson and told Robertson she needed to go to the emergency room for an immediate MRI. The district court also credited Dr. McLurkin's testimony that she attempted to make arrangements to transport Robertson to the emergency room via ambulance, but Robertson refused. The district court additionally concluded that Robertson had not proved that an earlier MRI or surgery would have changed her outcome.

Robertson appealed, arguing that the district court's conclusions are clearly erroneous. Robertson contends that Dr. McLurkin failed to diagnose her with CES, ensure she received an emergency MRI, or consult with a spine surgeon.

The FTCA allows civil suits against the United States for medical malpractice claims. *See* 28 U.S.C. §§ 1346(b)(1), 2674. State law controls such claims in FTCA cases. *See id.* § 1346(b)(1); *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008) ("State law controls liability for medical malpractice under the FTCA."). In Louisiana, a medical malpractice plaintiff must prove "(1) the standard of care applicable to the defendant; (2)

---

[2] Robertson sued several other healthcare providers in state court.

[that] the defendant breached that standard of care; and (3) [that] there was a causal connection between the breach and the resulting injury." *Schultz v. Guoth*, 2010-0343. P. 7 (La. 1/19/11), 57 So. 3d 1002, 1006 (citing LA. REV. STAT. § 9:2794).

For bench trials, we review findings of fact for clear error and conclusions of law de novo. *See* FED. R. CIV. P. 52(a)(6); *Kristensen v. United States*, 993 F.3d 363, 367 (5th Cir. 2021). We find clear error "only if we are left with the definite and firm conviction that a mistake has been committed." *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (internal quotation omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985).

Witness credibility determinations rest squarely within the district court's discretion. We do not "reweigh evidence," and we "must defer to the trial court's assessment of the credibility of witnesses." *Perez v. Bruister*, 823 F.3d 250, 269 (5th Cir. 2016). When a witness's testimony is "coherent and facially plausible" and is neither "contradicted by extrinsic evidence" nor "internally inconsistent," the district court's decision to credit such testimony "can virtually never be clear error." *Anderson*, 470 U.S. at 575.

We cannot conclude that the district court clearly erred by crediting Dr. McLurkin's testimony in this case. Dr. McLurkin plausibly testified that she informed Robertson that she might have CES and should go to the emergency room for an immediate MRI. Dr. McLurkin additionally testified that she started putting a plan in place for transferring Robertson via ambulance, but that Robertson refused to go to the emergency room because "they didn't do anything" at her previous visit and she wanted to go home.

The district court was free to believe Dr. McLurkin's testimony. *See, e.g.*, *DeJoria v. Maghreb Petrol. Expl., S.A.*, 935 F.3d 381, 393 (5th Cir. 2019) ("Choosing between conflicting testimony is the province of the factfinder."). That is especially true here, since no witness contradicted Dr. McLurkin's account. Robertson herself testified that she could not remember what Dr. McLurkin did or did not say, other than that she was ordering an MRI.

Robertson contends that Dr. McLurkin's testimony was self-serving and uncorroborated by Robertson's chart, which does not mention CES or document Robertson's refusal to go to the emergency room. But simply because testimony is self-serving doesn't mean that it is unreliable. *See, e.g.*, *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir. 1989) ("In a lawsuit, where each party is attempting to advance his own cause and protect his own interests, we are scarcely shocked when a party produces evidence or gives testimony that is 'self-serving.'"); *Bargher v. White*, 928 F.3d 439, 445 (5th Cir. 2019) ("Simply being 'self-serving[]' . . . does not prevent a party's assertions from creating a dispute of fact.").

In addition, Dr. McLurkin testified at trial as to why she did not document her efforts to send Robertson to the emergency room. According to Dr. McLurkin, "I just felt this sense of urgency, and I just kept hearing in my head, 'Cauda equina syndrome is a surgical emergency.' And so when she refused to go to the emergency room, we had to regroup." At that point, "[w]e had to change up the entire plan, and so I just wrote down quickly what we were planning on doing," which included attempting to obtain an urgent MRI through Medicaid. Dr. McLurkin testified that the change in plans was why "the first part of the note [in the chart] is documented well," but "the assessment and plan weren't." She thought that "with the lumbar radiculopathy and the anesthesia, any physician would be able to tell where my line of thinking was." She explained that the chart's plan included a one-

month follow-up visit because she "knew [Robertson] was going to have to have surgery" and wanted to hold appointment space for Robertson's postoperative care. She additionally stated that, notwithstanding the lack of information in the chart, she could still recall the events of that day because of her "photographic memory" and because "when you have a case in medicine that is so rare, you remember the details."[3]

Robertson also argues that Dr. McLurkin failed to consult a spine surgeon. But Dr. McLurkin testified that Robertson could not obtain an urgent outpatient neurological consultation through Medicaid. She testified that Robertson would have received a neurological consultation at the emergency room, and that, at the time she began planning to send Robertson to the emergency room, she instructed nurses to "find out who is on the unassigned call list for neurosurgery so I can give them a heads up." She further testified that when Medicaid denied the MRI, she called Robertson (who by that point had left the Iberia health center), again told her to go to the hospital, and asked Robertson to tell her which hospital she planned to visit so she could find out who the on-call neurosurgeon was. According to McLurkin, she "would have called," but Robertson "wouldn't give me a name of a hospital."

The district court did not clearly err by crediting Dr. McLurkin's testimony, including her explanation for why she did not document her efforts to urge Robertson to go to the emergency room. Robertson notes that the information Dr. McLurkin wrote in Robertson's medical chart at the time does not corroborate Dr. McLurkin's trial testimony. But neither does the chart contradict that testimony. Robertson does not point to any objective

_____

[3] Dr. McLurkin testified that, including Robertson, she had only seen two CES cases in her career. She testified in detail about the other case, which occurred during her residency.

evidence that clearly contradicts Dr. McLurkin's testimony, nor has she shown that Dr. McLurkin's testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson*, 470 U.S. at 575.

"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. We accordingly affirm.[4]

---

[4] Because we conclude that the district court did not clearly err in finding that Dr. McLurkin did not breach the standard of care, we need not address causation.